IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 25, 2020

**STATE OF TENNESSEE v. JEFFREY NEAL OLIVE**

**Appeal from the Circuit Court for Marshall County**
**No. 17-CR-139     Forest A. Durard, Jr., Judge**

_____

**No. M2019-01379-CCA-R3-CD**

_____

The Defendant, Jeffrey Neal Olive, was convicted by a Marshall County Circuit Court jury of second-degree murder, a Class A felony, and was sentenced to twenty years in the Department of Correction. On appeal, he argues that the evidence is insufficient to sustain his conviction and that his sentence is excessive and contrary to law. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and CAMILLE R. MCMULLEN, J., joined.

Donna Orr Hargrove, District Public Defender; William J. Harold (on appeal and at trial), and Michael Collins (at trial), Assistant Public Defenders, for the appellant, Jeffrey Neal Olive.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Assistant Attorney General; Robert J. Carter, District Attorney General; and William Bottoms and Drew Wright, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The Defendant was indicted and convicted of the July 2017 second-degree murder of his ex-wife, Mona Lisa Olive. We summarize the proof presented at his trial as follows.

Ricky Cheatham, the victim's brother-in-law, testified that at the time of the incident he lived in Marshall County with his wife, Debra Sue Cheatham; his wife's sister, the victim; and his mother, Bernadine Woodard. He recalled that the victim and the Defendant had been divorced for ten years but maintained an on-again, off-again relationship. The victim had been living with the Defendant prior to moving in with the Cheathams.

On July 16, 2017, the Defendant arrived at their house unexpectedly sometime in the early afternoon, asking to see the victim. The Defendant said that he and the victim "had a decision to make" and that he "wasn't leaving until he [talked to her]." Mr. Cheatham went and told the victim that the Defendant was there to see her. Mr. Cheatham described the Defendant's temperament as "ill but he wasn't . . . loud or anything[.]"

The Defendant and the victim went to the end of the house to talk, and the Defendant "got a little ill a little bit[,] but they went out on the porch and talked some more." The Defendant became loud again, and Mr. Cheatham looked out the door to quieten them down. Mr. Cheatham said that it was a pretty heated argument, and he looked out to make sure they were not physically fighting. After a while, the pair moved to the kitchen and continued to talk. Mr. Cheatham was in a room nearby and did not hear their conversation get loud or escalate into an argument again. The Defendant and victim had been in the kitchen for 20-30 minutes when Mr. Cheatham heard a gunshot.

Mr. Cheatham retrieved his gun and went to the kitchen to investigate. The Defendant was standing over the victim with a gun in his hand, and the victim was on the floor with her legs kicking. Mr. Cheatham heard the Defendant say, "[Y]ou got what you deserved, bitch." Mr. Cheatham told the Defendant to put his gun down, and the Defendant complied. The Defendant dropped to the ground, crying, and began shaking the victim in what Mr. Cheatham believed to be an attempt to help her. Mr. Cheatham's mother called 911. Mr. Cheatham agreed that the Defendant was not happy that it took emergency medical personnel some time to arrive. Once law enforcement and emergency medical personnel arrived on the scene, the Defendant was placed under arrest and CPR was initiated on the victim. Mr. Cheatham surmised that the gun he saw the Defendant holding was a .25 or .380 due to the small barrel. Mr. Cheatham did not recall having ever seen that gun before.

Bernadine Woodard, Mr. Cheatham's mother, testified that on the day in question, she walked into the kitchen and saw the victim and the Defendant talking. She left the room and, when she walked back through, their conversation had become slightly argumentative. She returned to her bedroom and, shortly thereafter, heard a gunshot. She ran into the kitchen and saw the victim lying on the floor and the Defendant standing over her. Ms. Woodard recalled that the Defendant was "standing over [the victim,] and he was slapping her and shaking her and telling her to wake up, that he didn't hurt her that bad."

She interpreted the Defendant's actions as trying to revive the victim. Ms. Woodard called 911 and, while she was doing so, the Defendant was yelling in the background for someone to call for help. Police and emergency medical personnel arrived about twenty minutes later. After the victim was taken from the scene, the police returned and searched for the gun. The gun was discovered in a box near the kitchen door that was filled with Ms. Woodard's sewing supplies.

Debra Cheatham, the victim's sister, testified that on the day in question, the Defendant showed up at their house wanting to speak with the victim. The victim and Defendant went outside on the porch to talk and then came inside and sat at the kitchen table. Mrs. Cheatham never heard the discussion become heated. While the couple was in the kitchen and Mrs. Cheatham was in the next room watching television, she heard the sound of a gunshot followed by a loud bang like something hitting the floor. Mrs. Cheatham said to her husband, "Oh, my God, he's shot and killed my sister," and they ran to investigate. Ms. Cheatham saw the Defendant standing over the victim, saying, "[Y]ou got what you deserve, B." Mrs. Cheatham was present when law enforcement found what they believed to be the murder weapon. She had never seen the gun before and was not aware of the victim having that gun. Mrs. Cheatham acknowledged that she went back to her room and called 911, so she was not aware of what anyone else said or did while she was on the phone. Mrs. Cheatham recalled that the victim and Defendant communicated over the phone that day until the victim shut off her phone and, sometime after that, the Defendant showed up at their house.

Several officers with the Marshall County Sheriff's Department and Lewisburg Police Department responded to the 911 call. The Defendant exited the house and was taken into custody. He was compliant and cooperative, but he denied knowing the location of the gun. The officers went inside to the kitchen where they found the victim lying on the floor with a small bullet wound in her chest. The victim was unresponsive, so the officers performed CPR until the paramedics arrived.

Detective Tony Nichols with the Marshall County Sheriff's Department testified that he responded to the scene as the lead detective after the victim had been taken to the hospital and the Defendant had been transported to jail. Detective Nichols processed the scene for evidence. He found a .25-caliber shell casing in front of the dishwasher, which he collected for later examination by the Tennessee Bureau of Investigation ("TBI") crime lab. He collected Mr. Cheatham's gun from inside the house for examination, as well as another gun, a .380-caliber pistol, from the Defendant's vehicle outside. After the gun from the Defendant's vehicle was examined, Detective Nichols realized that it was not the murder weapon and went back to the residence to search. He ultimately found a .25-caliber pistol in a box full of sewing patterns not far from the kitchen door. A bullet was recovered from the victim's body during autopsy and sent to the TBI crime lab for examination.

Detective Nichols testified that the Defendant requested to speak with him on July 17th. During the interview, the Defendant told the detective that he and the victim were "messing with a .25[-]caliber pistol that belonged to [the victim, and] . . . [the victim] accidentally got shot. I don't know if [the victim] shot herself or if I shot her, or we threw the gun and it went off and she got shot." The Defendant detailed his actions in trying to help the victim and told the detective that "fear was all over [him]."

On cross-examination, Detective Nichols admitted that he was not able to determine who owned the gun. Detective Nichols agreed that the Defendant's statement was meandering and at one point said that the .25-caliber gun belonged to the victim, but then asked to have that part of his statement struck. Detective Nichols acknowledged that the Defendant's account of some of his acts of trying to help the victim were corroborated by Mr. Cheatham.

Detective Drew Binkley with the Marshall County Sheriff's Department assisted Detective Nichols with the processing of the scene and collection of evidence. He testified consistently with the account provided by Detective Nichols.

Agent Kyle Osborne, a forensic scientist with the TBI crime lab, examined the Defendant's clothing for gunshot primer residue and found some on the clothing. The presence of gunshot primer residue indicated that the Defendant had been near a gun when it was fired, or had been in contact with a fired gun or recently fired ammunition components. On cross-examination, Agent Osborne acknowledged that the presence of gunshot primer residue on the Defendant's clothing does not show exactly what happened at the scene.

Agent Laura Hodge, a forensic scientist with the TBI crime lab, examined the bullet recovered from the victim's body and determined that it was fired from the .25-caliber gun that was found in the box of sewing patterns. Agent Hodge also examined the nightgown that the victim was wearing and did not find any gunshot or lead residue on it. In her opinion, the bullet hole in the nightgown did not have the visual characteristics of a "contact" shot. On cross-examination, Agent Hodge acknowledged that the results of her examination could not tell her what happened at the scene. She also acknowledged that certain things could diminish gunshot residue on an item and therefore prevent an accurate determination of the distance from which a shot was fired.

Paramedic Jessie Hayes testified that when he arrived at the scene, the victim's pulse was "weak and thready." She took two or three gasping breaths and became totally unresponsive. Mr. Hayes reinitiated CPR and transported the victim to the hospital in critical condition.

Dr. Thomas Mitchell took over treatment of the victim upon her arrival to the emergency room by ambulance. He continued with resuscitation efforts but was unsuccessful, and the victim was pronounced dead a short while later.

Dr. Feng Li, the chief medical examiner, testified concerning the autopsy of the victim that was performed by an assistant medical examiner. The cause of death was a gunshot wound to the chest, and the manner of death was ruled to be a homicide. Examination of the gunshot wound indicated that the shot occurred from an indeterminate/distance range, more than three feet from the victim. The wound track went from left to right, front to back, and top to bottom. In the medical examiner's view, it was "very unlikely" that the gunshot wound was self-inflicted. The toxicology report showed that the victim had oxycodone and its metabolite in her system; however, the substances were present in a therapeutic level and had nothing to do with her cause of death. On cross-examination, Dr. Li acknowledged that he could not say anything about the circumstances of the victim's death other than the findings of the autopsy.

Upon this evidence, the jury convicted the Defendant as charged, and the Defendant appealed.

## ANALYSIS

### I. Sufficiency

The Defendant argues that the evidence does not show that he "knowingly" killed the victim, but instead that he was "in a state of passion so intense that he lost control of himself and committed the act, followed by great remorse as soon as it was completed and the feeling had passed." Essentially, he asserts that the jury should have convicted him of voluntary manslaughter rather than second-degree murder.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas,

754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To sustain a conviction for second-degree murder, the State had to prove beyond a reasonable doubt that the Defendant committed a knowing killing of the victim. See Tenn. Code Ann. § 39-13-210(a)(1). "In second degree murder, the result of the conduct is the sole element of the offense. . . . The statute focuses purely on the result and punishes an actor who knowingly causes another's death." State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). "A person can act knowingly irrespective of his or her desire that the conduct or result will occur." State v. Gray, 960 S.W.2d 598, 604 (Tenn. Crim. App. 1997) (citing State v. Rutherford, 876 S.W.2d 118, 120 (Tenn. Crim. App. 1993)).

In the light most favorable to the State, the evidence shows that the Defendant and the victim were alone in the kitchen when a gunshot rang out. Witnesses ran into the kitchen and saw the Defendant standing over the victim with a gun in his hand. The victim sustained a gunshot wound to the chest. "This [c]ourt has recognized on numerous occasions that a jury is entitled to conclude that a defendant commits a knowing killing when he pulls a gun and fires it at a person." State v. James Daniel Vaughn, No. W2012-01728-CCA-R3-CD, 2013 WL 3807989, at *11 (Tenn. Crim. App. July 17, 2013).

The Defendant asserts that the jury should have convicted him of voluntary manslaughter rather than second-degree murder. As set out in Tennessee Code Annotated section 39-13-211, "[v]oluntary manslaughter is the intentional or knowing killing of

another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Whether adequate provocation exists so as to support a conviction for voluntary manslaughter is a question for the jury. See State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995) ("Whether the acts constitute a 'knowing killing' (second degree murder) or a killing due to 'adequate provocation' (voluntary manslaughter) is a question for the jury."). The Defendant presented the theory that he acted with adequate provocation to the jury, and the jury rejected it as was its province.

Moreover, the evidence calls into question several aspects of the Defendant's assertion. Although there was evidence that the Defendant and victim argued, it appears that the argument had subsided by the time they entered the kitchen. The absence of stippling on the victim's skin and the trajectory of the bullet suggests that the Defendant got up from the kitchen table, backed away, and then fired at the victim. The Defendant was overheard saying, "You got what you deserved, bitch." The evidence also suggests that the Defendant concealed the weapon. In addition, the Defendant told the police the shooting was an accident; he did not claim to have been provoked. A rational trier of fact could have found that any provocation suffered by the Defendant was inadequate.

## II. Sentencing

The Defendant also argues that the sentence imposed by the trial court is excessive and contrary to law. He asserts that he should have received the minimum sentence in his range.

A trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing; and

(8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and the sentencing decision of the trial court will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." State v. Bise, 380 S.W.3d 682, 709-10 (Tenn. 2012). Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701. Accordingly, we review the length of the sentences ordered by the trial court under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

The Defendant's presentence report was entered into evidence at the sentencing hearing and discussed by the officer who prepared the report. The report indicated that the Defendant had prior convictions for public intoxication in 2006 and driving under the influence in 2002. The Defendant self-reported a steady work history of manual labor type jobs until he was put on disability in 2011 following a neck surgery. The Defendant also reported that he had two older siblings with whom he had a good relationship and that he last consumed alcohol in 2016. The officer who prepared the report recounted that the Defendant expressed remorse about the incident.

The victim's sister, Mrs. Cheatham, testified to the negative impact the victim's death had on the family.

The trial court found two enhancement factors to be applicable: that the Defendant had a previous history of criminal history or criminal behavior, and he employed a firearm during the commission of the offense. See Tenn. Code Ann. § 40-35-114(1) and (9). However, the court did not afford much weight to the Defendant's previous criminal history as his prior convictions were somewhat minor and remote. The court gave some mitigation to the catchall factor based on the Defendant's social and work history. See id. § 40-35-113(13). On balance, the court imposed a mid-range sentence of twenty years.

The record shows that the trial court thoroughly considered and weighed the principles of sentencing and all the evidence before it in determining the Defendant's sentence. The trial court's imposition of a within-range sentence is entitled to a presumption of correctness absent an abuse of discretion, and we accordingly affirm the trial court's sentencing decision.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE